# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**MICHAEL D. SNOKE,**

    **Plaintiff,**

    v.

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

Civil Action 2:10-cv-1178
Judge George C. Smith
Magistrate Judge E.A. Preston Deavers

## REPORT AND RECOMMENDATION

Plaintiff, Michael D. Snoke, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for social security disability insurance ("SSI") benefits. This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 9), Defendant's Memorandum in Opposition (ECF No. 2), and the administrative record. For the reasons that follow, it is **RECOMMENDED** that the Court **AFFIRM** the decision of the Commissioner.

## I. PROCEDURAL BACKGROUND

Plaintiff received SSI as a child. As required by law, when Plaintiff turned eighteen, a Disability Hearing Officer redetermined his eligibility under the rules for determining disability for adults and found that he was no longer disabled as of July 1, 2007. Plaintiff appealed that decision. On December 15, 2009, Plaintiff, represented by counsel, appeared and testified at a hearing before an Administrative Law Judge ("ALJ"). A vocational expert ("VE") also appeared and testified. On May 10, 2010, the ALJ issued a decision finding that Plaintiff was not

disabled. (R. at 16–25.) The Appeal Council denied Plaintiff's request for review, making it the final decision of the Commissioner. Plaintiff timely commenced this civil action. In his Statement of Errors, Plaintiff contends that the ALJ and Appeals Council erred in concluding that he did not meet Listing 12.05C for mental retardation within 20 C.F.R. Part 404, Subart P, Appendix 1. Plaintiff alternatively asserts that the ALJ erroneously failed to include all of Plaintiff's limitations into his residual functional capacity ("RFC") calculation.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff and his attorney appeared before an ALJ on December 15, 2009. (R. at 157.) Plaintiff's counsel indicated that Plaintiff has continued to receive SSI pending the appeal. (R. at 159.) Plaintiff graduated high school in June of 2008, where he attended special education classes and had agricultural and automobile vocational training. (R. at 163.) Plaintiff testifed that in the 15 months between graduation and his hearing, he had not looked for a job because he could not find one he wanted. (R. at 163-64.) He also did not go to the Bureau of Vocational Services for assistance. (R. at. 164.) Plaintiff testified that he was disabled because he could not read well or spell, but stated that he would be able to do a job if no written work were involved. (R. at 167.) He indicated that he could perform farm work without difficulty, and had some past part-time summer farm jobs including bailing hay and feeding animals. (R. at. 164, 167, 177-78.) When performing those jobs, the farmer worked with him. (R. at 178.)

Plaintiff also testified that he stopped taking medication for his attention deficit disorder ("ADD") after high school, and that he had some problems with his attention, including forgetfulness. (R. at 168.) Plaintiff reported that a typical day involved getting up to feed his

farm animals, doing household chores, playing video games, watching 2-3 hours of TV, and visiting with his grandparents. (R. at 169.) He said he had about 10 friends and enjoyed hanging out with them, including bowling every Friday, going to the video arcade, and to movies. (R. at 170.) Plaintiff testified that he took care of his daily grooming and hygiene, prepared simple meals such as spaghetti and macaroni and cheese, washed his own dishes, and shopped for his own clothing. (R. at 171-72.) He could do his own laundry, but his father mostly did it, and his sister was in charge of the vacuuming and sweeping. (R. at 171.) Plaintiff testified he could live independently and manage his own finances. (R. at 172.) Plaintiff had his temporary driving permit for several months, but had not yet tried to get his regular licence because he was "nervous." (R. at. 166.) He liked board games, fishing, and hunting. (R. at 173-74.) He read the sports section of the newspaper and used to run track in high school. (R. at 173-74.)

**B.     The Vocational Expert's Testimony**

The ALJ asked the VE to consider an individual with Plaintiff's age and educational background, who had no past work experience, and had the following limitations: simple, routine tasks and social interactions; no fast-paced work; work that does not require functional literacy, meaning all instruction would be oral or hands on; and only occasional intermittent interaction with others. (R. at 183.) The VE testified that an individual with the foregoing limitations could perform 100 sedentary jobs, 12,500 light jobs, 2,400 medium jobs, and 900 heavy jobs in the regional economy. (R. at 181-84.) The VE identified jobs such as farm labor, janitorial, rag sorter, and laundry folder. (R. at 182-83).

### III. MEDICAL RECORDS

**A.     Dr. Jennifer Gibson**

In May 2007, Dr. Jennifer Gibson, Plaintiff's pediatrician, wrote that he was under her care from February 2003 through May 2006.  (R. at 143.)  She indicated that Plaintiff had school difficulties and behavioral problems that were "*partially* due to ADD but he is currently not being treated by me because he and his family showed persistent, recurrent misuse of controlled medications."  (R. at 144.)  Dr. Gibson could not assess his cognitive status because it had been over a year since she had seen him.  (*Id.*)  She wrote that Plaintiff's behavioral problems were always "ill-defined" due to many causes.  (*Id.*) She reported he was not compliant with medication and missed multiple appointments.  (R. at 145.)  Dr. Gibson opined that Plaintiff would benefit from medication, but stated that she had informed Plaintiff's mother that she would not prescribe medication until she and Plaintiff could demonstrate appropriate use.  (*Id.*)  After Dr. Gibson informed Plaintiff and his mother of this, they did not return for treatment.  (*Id.*)

**B.     Dr. Marc Miller**

In July 2007, Plaintiff had a psychological evaluation with Dr. Marc Miller, consisting of
a clinical interview and intelligence testing.  (R. at 101-06.)  Plaintiff reported that he got along well with his mother, stepfather, and siblings.  He also got along well with peers and staff at his school though he occasionally had temper outbursts.  (R. at 101.) He was enrolled in an agriculture vocational program through his school.  Plaintiff was able to take care of a variety of farm animals, and was active in Future Farmers of America.  (R. at 103.) His mother did the

grocery shopping and handled Plaintiff's funds. (*Id*.) Plaintiff did not suffer from depression, anxiety, or other emotional difficulties. (R. at 101.) Although he took medication for attention deficit in the past, he was non-compliant, and struggled academically. (R. at 101-02.) Plaintiff had fair hygiene and grooming, with soiled nails but clean hands and a clean shaven face. (R. at 102.) He was cooperative, friendly, made good eye contract, and had a good energy level. (*Id*.) His speech was intelligible and goal-oriented, with good receptive skills. (*Id*.) Dr. Miller noted Plaintiff was somewhat tense, immature, and sexually naive. (*Id*.)

Upon exam, Dr. Miller noted that Plaintiff had fair to poor concentration, poor organizational skills, moderate problem-solving abilities, and memory correlated with lower intellectual ability. (*Id*.) Plaintiff was, however, able to follow simple, one or two step instructions, and think in concrete terms. (*Id*.) His insight and judgment were fair; he had moderate motivation; and good social adaptation. (*Id*.)

Plaintiff's verbal IQ was 71, performance IQ was 68 and full IQ was 67. Dr. Miller noted that his past scores were higher and fluctuated. (R. at 103.) He functioned within the mild mental retardation range of intelligence. (R. at 103, 104.)

Plaintiff's mother reported behaviors that placed Plaintiff in the risk area of inattenion and impulsivity. Dr. Miller noted that this reported behavior coincided with a time that Plaintiff was not taking any medication. (R. at 103.) Dr. Miller diagnosed attention deficit disorder, without hyperactivity, and mild mental retardation. (R. at 104.) Dr. Miller opined that Plaintiff could carry out 1-2 step instructions and interact appropriately with others. (*Id*.) He further opined that Plaintiff had moderate to marked impairment maintaining attention span and concentration; moderate impairments dealing with stress and pressure; and no-to-mild

5

impairment in task completion. (*Id.*) Dr. Miller assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 65.[1] (*Id.*)

**C.     Dr. Meyer**

Dr. Steven Meyer reviewed Plaintiff's files for the state agency in July 2007. (R. at 107-124.) Dr. Meyer noted Plaintiff was not taking any medications or seeking any treatment, and that it had been more than a year since he had either treatment or medicine. (R. at 109.) His individualized educational plan ("IEP") showed good attitude and interaction, but difficulty staying on task because Plaintiff was more interested in being social. (*Id.*) Dr. Meyer opined that Plaintiff did not meet or medically equal any listing and that he had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate restrictions in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. at 111,121.) He determined that Plaintiff was capable "of simple and moderately complex routine work, that [he] is motivated to perform, oral and hands on instruction, at reasonable pace, in [a] setting with regular expectations, occasional intermittent interactions with others and some assistance at times of change in routine." (R. at 109.)

**D.     Dr. Todd Finnerty**

In August 2007, Dr. Todd Finnerty conducted a separate review of Plaintiff's records for the state agency. (R. at 125-142.) Like Dr. Meyer, Dr. Finnerty concluded that Plaintiff did not

---

[1]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. A GAF score of 61–70 is indicative of "[s]ome mild symptoms . . . ." *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).

meet or medically equal any listing. He further opined that Plaintiff had mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate restrictions in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. at 129, 139.) Dr. Finnerty wrote that although Plaintiff had learning disabilities and borderline-to-mild mental retardation, he "does not exhibit marked impairments and his ADD would be expected to improve with treatment compliance." (R. at 127.) Dr. Finnerty concluded that Plaintiff was "able to adapt to the workplaces as long as the job demands consist of simple one and two step tasks," that were routine in nature. (*Id*.)

## IV.   OTHER RECORDS

A 2005 evaluation of Plaintiff's abilities by his Evaluation Team at the Lancaster City School District showed that his past categorization from "developmentally handicapped" was changed to "learning disabled." (R. at 65-66.) Plaintiff's spelling skills were assessed in the "extremely low range," but his basic reading, reading comprehension, math-calculation abilities, math-reasoning skills, and ability to write short sentences were assessed "within the low average range." (R. at 67-68.)

In 2007, Plaintiff's mother reported that on a typical day, Plaintiff got dressed, went to school, did his daily chores, completed homework, watched TV or played a game, and went to bed by 10:00 p.m. (R. at 57.) He took care of pets and animals every day, including providing water and different feed to cows, dogs, rabbits, and chicken. (R. at 57.) Mrs. Snoke wrote that Plaintiff needed to be reminded to "bathe and brush," though she did not report that he had any difficulties in performing these tasks. (R. at 58.) He prepared snacks and simple meals such as sandwiches and frozen dinners. (R. at 58.) He also went outside by himself, mowed the lawn,

7

and cleaned his room. (R. at 59.) Mrs. Snoke noted that Plaintiff could perform instructions that were three steps or less, despite the fact that his attention span was 1-2 minutes. (R. at 58, 61.) Plaintiff enjoyed fishing, TV, camping, and playing video games. (R. at 60.) He could go to the mall unaccompanied and shop for clothes without reminders. (R. at 60.) Although he sometimes got in fights at school or with his sister, they were characterized as "nothing serious," and he had fewer conflicts with teachers in recent years. (R. at 60.) Plaintiff's mother reported that he did not follow instructions well, that staying focused was a challenge, and that it took a while to adjust to changes in routine. (R. at 61-62.)

In October 2007, Plaintiff had a meeting regarding his newest IEP. At the meeting, Plaintiff expressed interest in joining the Army National Guard, working in road construction, or becoming a diesel mechanic. (R. at 93.) His IEP noted that he had average nonverbal abilities and that he performed best with visual aids, repeated instruction, and limited distractions. (R. at 93.) His IEP set forth several goals, including maintaining independent employment and living unassisted post high school. (R. at 98.)

In November 2009, Plaintiff reported that he graduated high school and could read and write "somewhat." (R. at 151.) He indicated that he could mow the grass, lift 60 pounds, walk five miles, and do chores around the home. (R. at 153.) He noted enjoying playing video games, taking care of his pets and farm animals, doing yard work, going to the mall, and visiting with family and friends. (R. at 153.)

## IV. ADMINISTRATIVE DECISION

On May 11, 2010, the ALJ issued his decision. (R. at 16-25.) The ALJ explained that step one of the sequential evaluation process is inapplicable here because he was redetermining

Plaintiff's disability after he turned eighteen. (R. at 17.) At step two, the ALJ found that Plaintiff had the severe impairments of ADD and mild mental retardation. He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) In doing so, the ALJ explicitly considered Listing 12.05C for mental retardation.

The ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

Based upon careful consideration of the entire record, since July 1, 2007, the claimant as the residual functional capacity to perform a full range of work at all exertional levels but with nonexertional limitations to low stress work, which, in the claimant's case, is defined as simple routine non-fast paced tasks with infrequent changes that can be explained and that do not require functional literacy or more than occasional intermittent interaction with others.

(R. at 21.) Relying on the VE's testimony, the ALJ determined that at all times since July 1, 2007, Plaintiff has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (R. at 25.) He therefore concluded that Plaintiff has not become disabled since July 1, 2007. (*Id.*)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486

9

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the Commissioner's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. LEGAL ANALYSIS

Plaintiff asserts that the ALJ erred in concluding that he did not have a combination of impairments that met or medically equaled a listed impairment at step three of the sequential

analysis.[2] Specifically, Plaintiff contends that he met the requirements of Listing 12.05C. Plaintiff also appears to assert that the ALJ's RFC failed to fully account for his mental limitations. This Report and Recommendation addresses each argument separately.

**A. Listing 12.05**

The undersigned finds no error with the ALJ's conclusion that Plaintiff did not meet or

---

[2]The Commissioner has established a five-step sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520; *Hensley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009). Section 404.1520 sets forth the five steps as follows:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (See paragraph (b) of this section.)
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (See paragraph (c) of this section.)
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (See paragraph (d) of this section.)
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (See paragraph (f) of this section and § 404.1560(b).)
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. (See paragraph (g) of this section and § 404.1560(c).)

20 C.F.R. § 404.1520(a)(4).

medically equal Listing 12.05C. "At step three of the evaluation process, it is the burden of the claimant to show that he [or she] meets or equals the listed impairment." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727–28 (6th Cir. 2004). Accordingly, "[w]hen a claimant alleges that he [or she] meets or equals a listed impairment, he [or she] must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Id*. at 728.

The United States Court of Appeals for the Sixth Circuit has emphasized that there is no "heightened articulation standard" in considering the listing impairments. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (holding that an ALJ is not obligated to "spell[] out every consideration that went into the step three determination"). Instead, the Court reviews whether substantial evidence supports the ALJ's findings. *See id.* The Sixth Circuit has held, however, that an ALJ's decision must contain sufficient analysis to allow for meaningful judicial review of the listing impairment decision. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415–16 (6th Cir. 2011) (remanding where "[n]o analysis whatsoever was done as to whether [the claimant's] physical impairments . . . met or equaled a Listing under section 1.00"). In remanding for a lack of analysis, the *Reynolds* Court emphasized that it was "possible that the evidence [the claimant] put forth could meet" the listing at issue. *Id.* at 416.

Another district court has recognized that the requirements for an ALJ's listing impairment analysis are "[not] so legalistic that the requisite explanation and support must be located entirely within the section of the ALJ's decision devoted specifically to step three . . . ." *Staggs v. Astrue*, No. 2:09–cv–00097, 2011 WL 3444014, at *4 (M.D. Tenn. Aug. 8, 2011).

12

Rather, the Sixth Circuit has implicitly acknowledged that a court must read the ALJ's step-three analysis in the context of the entire administrative decision, and may use other portions of a decision to justify the ALJ's step-three analysis. *See Bledsoe*, 165 F. App'x at 411 (finding that an ALJ appropriately considered a claimant's combined impairments at step three in part because "[t]he ALJ described evidence pertaining to all impairments, both severe and non-severe, for five pages earlier in his opinion and made factual findings"). Various federal courts have acknowledged that other portions of an ALJ's decision may justify his or her step-three conclusions. *See, e.g.*, *Smith v. Astrue*, No. 11–1574, 2011 WL 6188731, at *1 (4th Cir. Dec. 14, 2011) (using an "ALJ's analysis at subsequent steps of the evaluation" to find that substantial evidence supported the step-three determination); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 735 (10th Cir. 2005) (holding that an ALJ's findings at step four and five precluded a claimant from qualifying for a listing under step three).

This case specifically involves Listing 12.05C. To satisfy Listing 12.05C, a claimant must establish the following:

> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

20 CFR Pt. 404, Subpt. P, App. 1 § 12.05. The Sixth Circuit has stressed that Listing 12.05 requires a claimant to establish both the diagnostic description of mental retardation as well as

one of the criteria set forth in subdivisions A through D. *Cooper v. Comm'r*, 217 F. App'x 450, 452 (6th Cir. 2007).

To satisfy the diagnostic description, a claimant must demonstrate three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations." *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009). A claimant may meet the onset requirement either directly or circumstantially. Specifically, the Sixth Circuit has found that "[w]hile the claimant may use a qualifying IQ score before the age of 22 to demonstrate that his subaverage intellectual functioning initially manifested during his developmental period . . . a claimant is by no means required to produce an IQ score obtained prior to age 22." *West v. Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 699 (6th Cir. 2007).

"The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills." *Hayes*, 357 F. App'x at 677. Although Listing 12.05 does not define "adaptive functioning," another portion of the Listings defines "adaptive activities" as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 CFR Pt. 404, Subpt. P, App. 1 § 12.00(C)(1). Furthermore, in considering Listing 12.05 the Sixth Circuit has noted that "[t]he American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments . . . in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Id*. (quoting DSM-IV-TR at 49).

Turning to the instant matter, within his step-three analysis, the ALJ found that Plaintiff

14

failed to satisfy Listing 12.05C because "the evidence . . . does not document the adaptive deficits required." (R. at 21.) The ALJ found instead that Plaintiff's "actual level of adaptive functioning is inconsistent with mental retardation and the requirements of Listing 12.05." (*Id.*)

In making this finding, the ALJ credited the State Agency reviewing psychologists' opinions that Plaintiff could perform simple tasks and that his overall intellectual and adaptive functioning were more consistent with borderline intellectual functioning. (*Id.*) The ALJ also pointed out that Plaintiff's school had designated him as learning disabled rather than mentally retarded and that his non-verbal activities had been assessed as average. (*Id.*) He noted that Plaintiff's November 2006 IEP indicated that Plaintiff had a good attitude and interacted well. (R. at 19.) The ALJ recognized that it was noted that Plaintiff had experienced difficulty staying on task, but pointed out that the reason given for this deficit was that Plaintiff was more interested in socializing. (*Id.*) The ALJ considered Plaintiff's treating physician's assertion that Plaintiff was not on medication due to recurrent misuse, but that his ability to stay on task would improve with medication. He also noted that Plaintiff's treating physician makes no mention of a diagnosis of mental retardation. (R. at 21.) The ALJ also considered the consulting examiner's observations, including that Plaintiff presented with an average appearance, grooming, and hygiene; he was cooperative friendly, and mannerly with good eye contact; his social adaptation was good; his expressive and his receptive skills were good. (R. at 20.) The ALJ observed that at the hearing, Plaintiff was able to understand and follow the hearing proceedings without any unusual difficulty and was able to respond to questions in an appropriate manner. (*Id.*)

Within his step-three analysis, the ALJ also extensively discussed the evidence in the

15

record concerning Plaintiff's adaptive activities. For example, he noted that Plaintiff did daily chores, including caring for cows, dogs, rabbits, and chickens, mowing the lawn, gardening, cleaning his room, taking out trash, and putting wood on the fire. (R. at 19-20.) He also noted that Plaintiff was able to follow three-step instructions, go shopping for clothes alone, that he had worked for a farmer part-time in the past bailing hay, cleaning stalls, and feeding animals, and that he had obtained his temporary drivers license. (*Id*.) The ALJ also considered the activities Plaintiff expressed that he enjoyed, including hunting, fishing, watching television, playing video games, going to the mall, running track in high school, camping, being active in Future Farmers of America, reading the sports section of the newspaper, visiting with his grandparents and friends, going to the movies, playing board games, and weekly bowling with his friends. (*Id*.)

After consideration of the record as a whole, the ALJ acknowledged that Plaintiff had some mild limitations in activities of daily living and no more than a moderate limitation in social functioning and concentration, persistence, and pace.[3] (R. at 20.) He noted that Plaintiff's "biggest problem appears to be in the area of concentration, persistence, and pace," but that "significantly, he has demonstrated sufficient concentration, persistence, and pace to perform the activity set forth above." (*Id*.) The ALJ therefore concluded that these limitations were not severe enough to satisfy Listing 12.05.

Plaintiff disagrees with the ALJ's conclusion. He asserts that the ALJ's findings establish that he suffered from the required deficits in adaptive functioning, but that the ALJ failed to recognize that the limitations he included in his RFC amounted to "deficits in adaptive

---

[3] The ALJ incorporated these limitations into Plaintiff's RFC.

functioning." (Pl's Stmt. of Errors 10, ECF No. 9.) The ALJ's RFC limited Plaintiff to simple "routine non-fast paced tasks with infrequent changes that can be explained and that do not require functional literacy or more than occasional intermittent interaction with others." (R. at 21.) Thus, the question for the Court is whether the foregoing limitations are of such severity as to require the conclusion that Plaintiff suffered from the requisite deficit.

The undersigned determines that the foregoing limitations do not require such a conclusion. The plain language of Listing 12.05 does not identify how severe limitations must be to qualify as "deficits in adaptive functioning." *Pendleton v. Comm'r of Soc. Sec.*, No. 1:10–cv–650, 2011 WL 7070519, at *11 (S.D. Ohio Dec. 23, 2011). Nevertheless, case law from the Sixth Circuit and other federal courts suggests that a claimant must have relatively significant deficits to satisfy the Listing. *See, e.g.*, *West*, 240 F. App'x at 698–99 (6th Cir. 2007) (suggesting that a claimant's ability to understand and retain simple instructions; maintain concentration and attention for basic tasks; interact effectively with co-workers; and deal with work stress all supported a finding of no deficiencies in adaptive functioning); *Harris v. Comm'r of Soc. Sec.*, 330 F. App'x 813, 815–16 (11th Cir. 2009) (claimant who did well in special education classes; was able to perform several jobs; and who had mild limitations in daily living activities, social functioning, and concentration did not have the type of deficits in adaptive functioning required for Listing 12.05C); *McMillan v. Comm'r of Soc. Sec.*, No. 1:10–cv–00308, 2012 WL 90264, at *6 (W.D. Mich Jan. 11, 2012) (holding that insignificant or trivial deficits were not sufficient to satisfy Listing 12.05 and that ALJ's finding of moderate restrictions in daily living did not require a finding of deficits in adaptive functioning). Here, the evidence the ALJ considered and relied upon constitutes substantial evidence supporting his conclusion that

Plaintiff does not have deficits in adaptive functioning. This evidence includes records from Plaintiff's school, his treating physician, his mother's reports, and a consultive exam, as well as Plaintiff's own testimony.

**B.     Plaintiff's RFC**

Within her second contention of error, Plaintiff appears to argue that the ALJ should have addressed her need for increased supervision within his RFC. Specifically, Plaintiff asserts as follows:

> [T]he limitation to no more than occasional intermittent interaction with others was a deficit in adaptive social/interpersonal adaptive function. In addition, that finding was directly contrary to SSR 85-16, which states such individuals are able to understand and carry out simple oral instructions 'under somewhat closer supervision than required of an individual with a higher IQ.' . . . Yet, the decision failed to reconcile how he could simultaneously perform a task with only occasional intermittent interaction with others, but at the same time have the enhanced supervision required by his IQ of 60-69. Certainly, the VE identified . . . no jobs that could accommodate these two opposing limitations.

(Pl.'s Stmt. of Errors 9, ECF No. 9.)

Plaintiff's reliance on Social Security Ruling 85-16 is misplaced. Social Security Ruling 85-16 provides, in pertinent part:

> [A]n individual, in whom the only finding in intellectual testing is an IQ between 60 and 69, is ordinarily expected to be able to understand simple oral instructions and to be able to carry out these instructions under somewhat closer supervision than required of an individual with a higher IQ. Similarly, an individual who has an IQ between 70 and 79 should ordinarily be able to carry out these instructions under somewhat less close supervision.

SSR 85-16, 1985 WL 56855, at *3 (1985). The Ruling makes clear, however, that the Commissioner should also consider other evidence, including the observations of medical sources, in assessing a claimant's mental RFC. *Id.* at 4. As the plain language of Ruling 85-16 and this Court's past decisions both suggest, Ruling 85-16 does not compel the conclusion that

18

all claimants with an IQ score between 60 and 69 receive a RFC limitation of close supervision. *See Delp v. Comm'r of Soc. Sec.*, No. 2:09-cv-460, 2010 WL 3672330, at *4 (S.D. Ohio Sept. 16, 2010) ("Ruling 85-16 does not state that an individual with such a low IQ score always requires 'somewhat closer supervision.'"). Here, the ALJ properly omitted restrictions for close supervision because substantial evidence of record indicated that Plaintiff did not need this accommodation. Neither Plaintiff's treating physician nor the consulting examiner opined that Plaintiff required enhanced supervision. Rather, Dr. Meyer found that Plaintiff would need oral and hands-on instruction, which the ALJ accommodated with a requirement of "infrequent changes that can be explained." (R. at 21, 109.) Further, Plaintiff testified that he could work so long as the job was "hands on" and did not require written work. (R. at 164, 167.) Accordingly, the undersigned concludes that the ALJ did not err in his calculation of Plaintiff's RFC.

## VII. CONCLUSION

From a review of the record as a whole, the undersigned concludes that there is substantial evidence supporting the ALJ's decision denying benefits. It is therefore **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the decision of the Commissioner.

## VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: February 22, 2012

/s/ *Elizabeth A. Preston Deavers*
Elizabeth A. Preston Deavers
United States Magistrate Judge